# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **JANICE DAVIDOW, individually and on behalf of others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No.** |
| **H&R BLOCK, INC., and** **H&R BLOCK TAX SERVICES LLC,** | ) ) ) | |
| **Defendants.** | ) ) | **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Janice Davidow, on behalf of herself and all persons similarly situated, for her cause of action against defendants H&R Block, Inc. and H&R Block Tax Services LLC (collectively, "H&R Block"), alleges as follows:

### NATURE OF THE CASE

1. This is an antitrust class action brought by and on behalf of individuals who work or have worked for H&R Block, a tax preparation services company and franchisor, for unlawfully conspiring to suppress the wages and impede job mobility of its employees through agreements with its franchisees not to compete for workers in violation of Section I of the Sherman Act. H&R Block orchestrated and enforced this conspiracy at least in part through an explicit contractual prohibition ("No-Poach Clause") contained in standard H&R Block franchise agreements that severely limited Plaintiff's and Class members' job mobility and served to significantly suppress their compensation.

1

## JURISDICTION AND VENUE

2.   Plaintiff Janice Davidow brings this action to obtain injunctive relief and recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3.   The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and 28 U.S.C. §§ 1331 and 1337.

4.   Both H&R Block defendants have their principal place of business in Kansas City, Missouri and thus are subject to personal jurisdiction in this Court.

5.   Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims alleged herein occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Defendants reside in, can be found in, and/or transacts business in this District.

## THE PARTIES

6.   Plaintiff Janice Davidow is an individual residing in Coral Springs, Florida. Plaintiff worked as a seasonal tax preparer for H&R Block in Coral Springs, Florida for the 2012-2013 tax seasons. As a result of the conspiracy described herein, Plaintiff's compensation was suppressed during the time she worked for H&R Block.

7.   Defendant H&R Block, Inc., is a Missouri corporation with headquarters at One H&R Block Way in Kansas City, Missouri.

Case 4:18-cv-01022-ODS   Document 1   Filed 12/31/18   Page 2 of 27

8. Defendant H&R Block Tax Services LLC is a Missouri limited liability company and a wholly-owned subsidiary of defendant H&R Block, Inc. It is also headquartered at One H&R Block Way in Kansas City, Missouri.

9. Various persons, partnerships, sole proprietors, firms, and corporations, the identities of which are presently unknown, including H&R Block franchisees as well as direct and indirect subsidiaries of defendant H&R Block, Inc. that operate company-owned stores, have participated as co-conspirators with H&R Block in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy, or in furtherance of the anticompetitive conduct.

10. Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

**FACTUAL ALLEGATIONS**

11. Throughout the Class Period, H&R Block and co-conspirators employed Class members throughout the United States.

12. H&R Block's conduct substantially affected interstate commerce, and caused antitrust injury, throughout the United States.

3

13. H&R Block holds itself out as the "world's largest consumer tax services provider" and provides tax preparation and assistance services through a variety of avenues. Individuals can make an appointment with a tax preparer at a physical office, can access the assistance of a "tax pro" remotely, and can download tax filing software via desktop and mobile applications.

14. H&R Block provides in-person tax preparation services at approximately 10,000 offices across the United States. As of 2018, approximately 3,300 of its locations are franchise-owned while the remaining approximately 6,700 of its U.S. offices are corporate-owned.

15. H&R Block boasts that it employs "70,000 highly trained tax professionals worldwide." https://www.hrblock.com/corporate/pdfs/hrb-factsheet.pdf (last visited Nov. 16, 2018).

16. Employees in tax preparations and assistance services, like personnel in any labor market, benefit when their employers compete for their services. Competition in the labor market creates leverage for personnel, which in turn leads to higher wages and greater mobility.

17. Beginning at least by January 2009 and continuing until at least May 2018, H&R Block, along with other unnamed persons and entities acting as co-conspirators, enacted a scheme related to the recruitment of employees and potential employees, which included policies and agreements not to solicit or recruit without prior approval each

4

other's personnel.

18. The standard H&R Block franchise license agreement entered into by H&R Block and its franchisees during the Class Period includes a "Restrictions on Competition" clause that states: "During the term of this Agreement, neither Franchisee nor any of Franchisee's Associates will, without H&R Block's prior written consent . . . . Solicit for employment any person who is employed by H&R Block or by any other franchisee of H&R Block."

19. Instead of a one-way agreement by franchisees to not solicit or recruit employees from either other franchisees or from H&R Block's company-owned stores, H&R Block itself adhered to the same agreement in the operation of its company-owned stores.

20. The purpose and effect of this scheme was to limit and suppress mobility and compensation for class members.

21. These agreements impeded or restricted the movement of employees between H&R Block and its franchisees. These agreements also prohibited and prevented competition between and among H&R Block and its franchisees for employees. The agreements unreasonably limited franchisees' ability to solicit employees who work for H&R Block or other franchisees, reducing the pool of experienced candidates available to them and decreasing the employment options available to current employees. Basic economic principles inform that a reduction in the pool of potential employers tends to lower the bargaining power of employees and depress wages, especially if the lost

5

opportunities were superior to their current employment.

**Background on the H&R Block Franchise Model**

22. H&R Block was founded in 1955 by two brothers, Henry and Richard Bloch, in Kansas City, Missouri and quickly expanded to New York City and then soon after the first H&R Block franchisees began.

23. The franchise program rapidly stretched the reach of H&R Block throughout the United States. Within five years of its first franchise agreements, H&R Block had opened 200 more offices. Then, during the 1970s, its business expanded to more than 8,600 offices across the United States.

24. Today, H&R Block has both corporate and franchise locations in nearly every state as well as the District of Columbia and generates over $3.1 billion in annual revenue.

25. H&R Block, Inc., the parent holding company, has partially diversified its business since the 1960s, but tax preparation services remain the company's core business. Many of H&R Block, Inc.'s non-tax preparation affiliates provide ancillary services such as financing to franchisees or customers.

26. H&R Block's major revenue sources include for tax preparation fees and related services performed at corporate-owned tax offices, franchise royalties, sales of desktop tax preparation software, and fees from related services and products.

**H&R Block's Franchise Model**

27. H&R Block receives profits from its franchises primarily through charging

6

royalties on the franchises' gross revenue.

28. H&R Block franchises throughout the United States operate on standardized terms pursuant to a common franchise license agreement. They are competitors with H&R Block and with each other. As stated in H&R Block's standard franchise agreement, H&R Block franchisees function in an "independent contractor" relationship with H&R Block. The franchise agreement states that such franchisees are not "a joint venturer, joint employer, partner, agent, fiduciary, or employee" of H&R Block. In fact, the franchise agreement prohibits franchisees from holding themselves out as such.

29. The franchise agreement further spells out that, as to the franchisee and H&R Block, "neither party will have any power to bind or obligate the other; and neither party will be liable to any person for any debts or liabilities incurred by the other."

30. The H&R Block Franchise Disclosure Document ("FDD"), which summarizes and explains its standard franchise license agreement and practices, expressly states on page 1 that H&R Block, including its corporate-owned locations, and its franchisees are competitors: "[The franchisee's] direct competition from national and local tax return tax preparation firms will include [H&R Block] affiliates."

31. The FDD provides that franchisees operate within a defined Franchise Territory, but do "not, however, receive an exclusive Franchise Territory." On the contrary, franchisees may "face competition from other offices that [H&R Block] franchise[s] or own[s], or that are franchised or owned by [H&R Block's] parent or affiliates, or from

7

other channels of distribution or competitive brands [H&R Block] control[s]."

32. Additionally, the FDD provides that H&R Block or its affiliates may provide the same products and services as the franchisee in the Franchise Territory under a different mark within the Franchise Territory, "regardless of proximity to or economic impact upon [the] Franchised Business."

33. H&R Block's standard franchise agreement states that all decisions related to employment are to be made entirely and independently by each franchisee. Further, it states that employees of the franchisee are not employees of H&R Block:

> All employees hired by or working for Franchisee will be solely the employees of Franchisee and not employees of H&R Block or subject to H&R Block's control. Specifically, Franchisee will have exclusive control over all employment related decisions, including decisions concerning hiring, firing, wages, conditions of employment, discipline, staffing, or any other day-to-day management of employees. H&R Block has no obligation or right to control any franchise employment issue.

34. Thus, as H&R Block's standard franchise agreement and FDD make clear, H&R Block franchise locations do and are intended to compete with each other as well as with H&R Block corporate-owned locations. Each franchisee independently owns and operates its franchise location(s) as such. Among other things, such franchisees possess and exercise sole and complete decision-making authority as to all employment-related decisions, including but not limited to recruitment, hiring, firing, advancement, promotion, staffing, compensation, conditions of employment, discipline and other day-to-day management of employees. The only restriction placed on the franchisees is to not

8

compete over the labor pool.

35. But for the conspiracy, and the conduct of H&R Block and its agents and co-conspirators in furtherance thereof, each H&R Block franchisee would have competed with other H&R Block franchisees and with H&R Block itself for employees and would have engaged in competition and would have solicited and recruited employees from other H&R Block franchisees and from H&R Block corporate-owned locations.

**The No-Poach Agreements between and among Competing H&R Block Locations**

36. Notwithstanding the franchise license agreement's definition of the franchisor-franchisee relationship, H&R Block and its franchises have agreed not to compete with respect to recruitment and other aspects of competition with respect to the soliciting and recruiting of employees.

37. Specifically, until May 2018, H&R Block's franchise agreement, which franchisees are required to sign, included a clause prohibiting any H&R Block franchise from hiring any employees of H&R Block, including its corporate-owned tax offices, or employees of other H&R Block franchises. This clause (the "No-Poach Clause") provides:

> During the term of this Agreement, neither Franchisee nor any of Franchisee's Associates will, without H&R Block's written consent… [s]olicit for employment any person who is employed by H&R Block or by any other franchisee of H&R Block;

38. The anti-poaching scheme was between and among separate economic actors pursuing separate economic interests such that the agreement deprives the marketplace generally and, more importantly, the class members of the benefits of independent

9

centers of decision making as well as the benefits of free and open competition.

39. The No-Poach restriction was not intended or limited to simply protecting H&R Block's investment in training its employees at corporate-owned offices. After all, the franchise offices' employees were required to meet the same training requirements.

40. The restriction placed on franchisees from poaching employees from other franchisees further underscores the true purpose and value of the No-Poach Clause and surrounding policies to H&R Block: restricting competition for employees in the market and artificially suppressing wages among competing firms in a highly specialized sector.

41. While the No-Poach Clause in the standard franchise license agreement ostensibly placed an obligation only on franchisees, H&R Block operated under the same policy to effectuate and enforce the anticompetitive agreement.

42. Enforcing this agreement was a central part of the recruiting and hiring process at H&R Block. For example, the first question on H&R Block's online application for its corporate tax offices asks, "Have you ever worked for H&R Block or a H&R Block Franchise affiliate?" If yes, applicants are prompted to input their H&R Block Employee ID. This question is separate and apart from and precedes the history of employment portion on the application. This allows the prospective H&R Block employer to easily flag applicants who are or have been employed by competing H&R Block franchisees or H&R Block corporate stores. The purpose and effect of this provision is to enforce and perpetuate the Conspiracy, in particular, by identifying and preventing violations of the

agreement.

**Employee Recruitment, Hiring, and Training**

43. As one of the largest providers of tax preparation services in the United States, H&R Block has a critical need for workers trained not only in tax preparation and assistance but also in the H&R Block System. The same is true for H&R Block franchisees.

44. At the height of the 2018 tax season, H&R Block employed over 70,000 individuals, including tax professionals and other administrative staff. Franchise locations additionally employ an estimated 20,000-30,000 employees—many of whom are seasonal.

45. Due to the seasonal nature of tax preparation and related services, H&R Block and its franchisees must recruit and hire a large number of new or returning employees every year. As H&R Block highlights in its 2018 Form 10-K disclosure to the Securities and Exchange Commission, H&R Block's "business is dependent on the availability of a seasonal workforce, including tax professionals, and [its] ability to hire, train, and supervise these employees."

46. H&R Block's Form 10-K further underscores the importance of recruiting and hiring large numbers of qualified tax preparers each tax season due to the "specialized and highly seasonal nature" of the tax preparation business, that "presents financial risks and operational challenges, which, if not satisfactorily addressed, could materially affect our business and our consolidated financial position, results of operations, and cash

flows."

47. In particular, H&R Block states that, "[s]uccess in [the] industry depends on our ability to attract, develop, motivate, and retain key personnel in a timely manner, including . . . those in seasonal tax preparation positions or with other required specialized expertise, including technical positions. The market for such personnel is extremely competitive, and there can be no assurance that we will be successful in our efforts to attract and retain the required personnel."

48. As H&R Block recognized in its Form 10-K filing, the regular need each tax season for qualified tax preparation workers would otherwise lead to healthy competition between H&R Block, its franchise locations, and other companies providing tax preparation services, and thus, higher wages, benefits, compensation and other terms of employment. Instead, as part of its efforts to "satisfactorily address[]" the threats to cash flow associated with the seasonal turnover of employees in an "extremely competitive" market, H&R Block conspired with its franchisees and other co-conspirators to restrict employee mobility and competition in the market, with the purpose and effect of reducing and restricting mobility and limiting and reducing wages, benefits, compensation and other terms of employment.

**Required Training Specific to Employment at H&R Block and Its Franchises**

49. Each H&R Block tax professional must invest hundreds of dollars and dozens of hours to complete H&R Block-specific educational requirements before even being

12

considered for employment at H&R Block or its franchises, unless he or she passes a test to demonstrate equivalent knowledge. Completing those requirements provides no guarantee of employment. Further, tax preparers seeking to work in subsequent tax seasons after being hired by H&R Block and its franchises must complete at least 18 hours of additional H&R Block-specific training before being considered for re-hire.

50. To meet the need for the large number of tax professionals required to staff the company's many corporate and franchise office locations, H&R Block established "H&R Block Income Tax Schools" as early as 1978 to provide introductory income tax courses to individuals with no background in tax return services as well as supplemental courses for more experienced tax professionals. Today, the introductory Income Tax Course provides 60 to 89 hours of instruction relating to tax forms. Classes are typically held at local H&R Block offices—both corporate-owned and franchise locations—with additional sessions provided online. Students must pay for course materials.

51. To apply for a job with H&R Block or an H&R Block franchise, a prospective employee must either take the 60-hour Income Tax Course or pass a test to demonstrate equivalent knowledge. A high school diploma is not a prerequisite for enrolling in the Income Tax Course or taking the knowledge exam.

52. The course requirement is not considered training, as H&R Block will not even consider an application until a prospective employee fulfills the course requirement or passes an equivalent knowledge test. Rather, completion of the course is a prerequisite to

13

being considered for employment.

53. Instead, H&R Block's marketing materials advertise that the basic Income Tax Course helps individuals master their own annual returns and "can also lead to a job." Completion of the course does not guarantee employment at H&R Block.

54. H&R Block's marketing materials further clarify that the course "is not intended for, nor open to any persons who are either currently employed or seeking employment with any professional tax preparation company or organization other than H&R Block [or one of its franchise offices]. During the course, should H&R Block learn of any student's employment or intended employment with a competing professional tax preparation company or service, H&R Block reserves the right to immediately cancel the student's enrollment."

55. Upon successful completion, H&R Block Income Tax Course students receive an H&R Block Certification. This Certification is a prerequisite for most if not all tax preparation jobs at H&R Block corporate or franchise locations.

56. In addition, seasonal tax preparation workers must complete at least 18-24 hours of H&R Block training before they can be considered for rehire in a subsequent tax season.

57. These H&R Block-specific education requirements are the primary qualifications for open tax professional positions at corporate-owned and franchise offices.

58. The principal educational qualifications of many employees at H&R Block's corporate-owned or franchise offices are completion of highly specialized, H&R Block-

14

specific trainings and certifications.

59. With limited educational qualifications apart from hundreds of hours invested in H&R Block-specific training, many tax professionals at H&R Block's corporate-owned and franchise locations are uniquely suited to working at H&R Block or one of its franchise locations. Based on H&R Block's franchise-specific education requirements for all corporate-owned and franchise locations, employees should generally be highly mobile between H&R Block's corporate-owned and franchise offices.

60. In the absence of H&R Block's anticompetitive conduct, competition between and among Defendants and co-conspirators for H&R Block-trained workers in the highly specialized and technical tax preparation services industry, particularly within the H&R Block System, would be robust and would have increased and enhanced the workers' compensation and mobility.

**The H&R Block System**

61. In addition to the specialized training for tax preparers, franchisees and management-level employees must complete further specialized training on the H&R Block System.

62. H&R Block utilizes "a distinctive system" for establishing and operating tax return preparation businesses and performing related services ("System"). According to its FDD, the H&R Block System includes "proprietary processes, methods and software; standards, specifications and procedures for operations; procedures for management

control; training and assistance; and advertising and promotional programs."

63. Both corporate-owned and franchise offices and their employees must operate according to the H&R Block System.

64. To ensure familiarity and compliance with the distinctive H&R Block System, franchisees and their management-level employees must attend training on the System before their first and second tax seasons. Under the standard franchise agreement, the franchisee is responsible for the travel expenses, room, board, and wages for the training. These initial and other ongoing trainings cover topics including franchisor/franchisee commitments, personnel management and training programs, and the H&R Block service model.

65. As a result of the H&R Block-specific training, education, and qualification requirements, including as to H&R Block proprietary processes, procedures, methods, and software, as in H&R Block Income Tax Courses and Schools, employment with a non-H&R Block tax preparation company or business is not a reasonable substitute for the employees of H&R Block and their franchises.

**The Purpose and Effect of this Scheme was to Restrict Mobility and Suppress Compensation**

### *Restricted and Reduced Mobility*

66. H&R Block's anticompetitive scheme has restricted and reduced mobility between H&R Block corporate-owned and franchise locations.

67. The H&R Block website provides information about more than 65,000 tax

16

professionals working at corporate-owned or franchise offices. Tax professionals with differing degrees of seniority and training carry different titles, including Master Tax Advisor, Senior Tax Analyst, Tax Analyst, Senior Tax Specialist, Tax Specialist and Tax Associate.

68. Nearly 70% of the 70,000 tax professionals listed on H&R Block's website are affiliated with a single corporate-owned or franchise office. An employee being associated with only one location would comply with the No-Poach Clause and the conspiracy. Approximately 26% are listed as working at multiple corporate-owned offices, and an additional 4% are affiliated with multiple offices within one franchise group—that is, franchise locations owned by the same franchisee. These associations also would comply with the No-Poach Clause and the conspiracy. Only 0.41%, however, are affiliated with both company-owned and franchise offices. And only 0.28% of tax professionals are affiliated with offices in more than one franchise group. Thus, approximately 99.3% of current employees at H&R Block's corporate and franchise offices appear to be in compliance with the terms of No-Poach Clause and the conspiracy, while about 0.7% of current employees appear to be noncompliant.

69. The small number of employees affiliated with both a corporate-owned office and a franchise office—particularly in comparison to the much larger number of employees at multiple corporate-owned locations or offices within the same franchise group—help demonstrate not only that the No-Poach Clause in the standard franchise agreement is

17

routinely enforced, but also that the H&R Block corporate-owned stores adhere to a parallel rule not to solicit or recruit employees from franchisee offices. These agreements and policies eliminate incentives and abilities of franchisees and corporate-owned offices to compete for employees.

70. The scheme restricted employees' job mobility by decreasing the pool of potential employers and eliminating competition. This, in turn, has led to suppressed wages, compensation and other benefits, compounded over the long term of the conspiracy.

71. The anticompetitive agreement and its harmful effects were not limited to tax professionals but extended to managers, executives and other employees of H&R Block.

*Suppressed Compensation*

72. H&R Block and franchisee employees have roles in tax preparation, customer service, and administrative or management positions. For each of these roles, employees at H&R Block and its franchises are paid below the national salary for similar job titles.

73. For example, H&R Block Seasonal Tax Preparers have an average base pay of approximately $10.86 per hour, while the Bureau of Labor Statistics ("BLS") hourly mean wage for a tax preparer is $22.67 per hour. H&R Block receptionists reportedly earn approximately $9.80 per hour while the BLS hourly mean wage for receptionist is $13.65.

74. But for the conspiracy, employee compensation at H&R Block corporate-owned and franchise offices would be significantly higher.

18

**Illegality and Anticompetitive Harm of Franchise No-Poach Agreements**

75. On or about July 9, 2018, the Attorneys General of 10 states and of the District of Columbia announced an investigation into the anticompetitive hiring and recruiting practices and procedures used by several large franchise companies, and stated that:

> [W]e are concerned about the use of No Poach Agreements among franchisees and the harmful impact that such agreements may have on employees in our States and our state economies generally. By limiting potential job opportunities, these agreements may restrict employees' ability to improve their earning potential and the economic security of their families. These provisions also deprive other franchisees of the opportunity to benefit from the skills of workers covered by a No Poach Agreement whom they would otherwise wish to hire. When taken in the aggregate and replicated across our States, the economic consequences of these restrictions may be significant.

76. Within days of the announcement of the States' investigation, H&R Block made public that it had agreed to end its practice of including and enforcing No-Poach Agreements in franchise contracts.

**CO-CONSPIRATORS AND AGENTS**

77. The anticompetitive and unlawful acts alleged against H&R Block were authorized, ordered or performed by H&R Block and its respective directors, officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of H&R Block's businesses or affairs.

78. Individuals and/or entities not named as defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

79. Each Defendant acted as the principal, agent, or joint venturer of, or for other Defendants with respect to the acts, violations, and common course of conduct alleged herein. The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed between the H&R Block principals and agents.

80. Accordingly, H&R Block's principals are liable for the acts of their agents. Likewise, the H&R Block agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied or apparent authority.

## CLASS ACTION ALLEGATIONS

81. Plaintiff brings this action on behalf of herself and all others similarly situated ("the Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All persons who worked at any H&R Block tax office in the United States, whether owned and operated by H&R Block or by its franchisee, at any time between January 1, 2009, and May 10, 2018.

Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the H&R Block or co-conspirators and their wholly owned subsidiaries, as well as personnel hired outside of the United States to work outside of the United States.

82. Based on the nature of trade and commerce involved, as well as the scope and duration of the conspiracy, there are tens of thousands of Class members geographically

dispersed throughout the United States. Therefore, joinder of all members of the Class is

not practicable.

83. The questions of law or fact common to the Class include, but are not limited to:

    a.   whether the agreement violated the Sherman Act;

    b.   whether the scheme and No Poach Agreement, or any one of them, constitute a *per se* violation of the Sherman Act;

    c.   whether the scheme and associated agreements restrained trade, commerce, or competition for labor;

    d.   whether Plaintiff and the Class suffered antitrust injury or were threatened with injury; and

    e.   the type and measure of damages suffered by Plaintiff and the Class.

84. These and other questions of law and fact common to the Class predominate over

any questions affecting only individual Class members.

85. Plaintiff's claims are typical of the claims of the Class.

86. Plaintiff will fairly and adequately represent the interests of the Class and has no

conflict with the interests of the Class.

87. Plaintiff has retained competent counsel experienced in antitrust litigation to

represent herself and the Class.

88. H&R Block and the co-conspirators have acted on grounds generally applicable to

the Class, thereby making final injunctive relief appropriate with respect to the Class.

89. A class action is superior to alternative means of adjudicating this controversy

because it will eliminate repetitive litigation and because prosecuting separate actions by

individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for H&R Block.

ANTICOMPETITIVE EFFECTS

90. The anticompetitive agreement reduced competition for labor. H&R Block and the co-conspirators entered into, implemented, and policed these agreements with knowledge of the overall conspiracy, and did so with the intent and effect of fixing, retraining and stabilizing the compensation paid to its personnel at artificially low levels.

91. The harm not only reached individuals who sought to change their employment from one franchise or corporate office location to another, but also extended to those who had no intention of changing from one franchise or corporate office location to another, due to, *inter alia*, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

92. While the scheme constitutes a *per se* violation of the Sherman Act, H&R Block and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the labor market for tax professionals and managers at H&R Block, as defined herein, in the United States.

93. Through the conspiracy, H&R Block exercised and maintained this power, and did in fact suppress wages, benefits, job mobility, and other aspects of compensation and eliminate competition.

94. The scheme and the conduct of H&R Block and its agents and co-conspirators in

22

furtherance thereof did not have procompetitive effects and were not intended to have procompetitive effects.

95. In the alternative, H&R Block is liable under a "quick look" analysis where one with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on class members and markets.

96. In the alternative, any procompetitive effects that may have resulted from the scheme and/or the conduct of H&R Block and its agents and co-conspirators in furtherance thereof were and are outweighed by the anticompetitive harm alleged herein, including but not limited to restricting employee mobility and suppressing wages, benefits, and other aspects of compensation.

## EQUITABLE TOLLING AND STATUTE OF LIMITATIONS

97. While Plaintiff had knowledge of aspects of H&R Block's and industry recruiting practices, Plaintiff had neither actual nor constructive knowledge of H&R Block's unlawful conspiracy until, at the earliest, H&R Block's public announcement that it had ended the practice of including and enforcing No-Poach Agreements in franchise contracts on or around July 12, 2018. Nor did Plaintiff have any reason to suspect that H&R Block was illegally acting in concert to suppress wages and the labor market. At no point did H&R Block inform Plaintiff that its compensation was not competitive but was instead suppressed by H&R Block's anticompetitive agreements. Plaintiff therefore did

23

not know of, did not discover, and could not have discovered through reasonable diligence, the existence of the conspiracy outlined in the foregoing allegations.

98. Conspiracies, by their nature, must be concealed. To keep the scheme hidden from employees and prospective employees, H&R Block and its co-conspirators did not publicize the No-Poach Clause. H&R Block also did not inform employees of the scheme between H&R Block and its franchises at any time.

99. H&R Block concealed the conspiracy by giving false and pretextual explanations for hiring and compensation decisions, including that the decisions were based on merit, the operation of free and open competition, and other considerations.

100. As a result of H&R Block's and its co-conspirators' successful efforts to conceal the fact and scope of the conspiracy, the running of any applicable statute of limitations has been tolled with respect to Plaintiff's claims concerning H&R Block's conspiracy.

## COUNT I: VIOLATIONS OF SECTIONS 1 AND 3 OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3

101. Plaintiff incorporates each allegation above as if set forth herein.

102. Beginning no later than January 1, 2009, and continuing until in or around May 2018, H&R Block entered into and engaged in unlawful agreements in restraint of trade and commerce, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

103. H&R Block's agreements have included concerted actions and undertakings among themselves and their co-conspirators with the purpose and effect of: (a) fixing, reducing and stabilizing the wages, benefits and other aspects of compensation of

Plaintiff and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among H&R Block for labor.

104.    As a direct and proximate result of H&R Block's combinations and contracts to restrain trade and eliminate competition for labor, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition on the merits.

105.    The unlawful agreements among H&R Block and their co-conspirators have had the following effects, among others:

a.    competition among H&R Block for labor has been suppressed, restrained, and eliminated; and

b.    Plaintiff and Class members have received lower compensation and experienced decreased job mobility from H&R Block than they otherwise would have received in the absence of the anticompetitive agreement and, as a result, have been injured in their property and have suffered damages in an amount subject to proof at trial.

106.    The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations, and/or conspiracies were authorized, ordered, or committed by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

107.    H&R Block's contracts, combinations, and/or conspiracies are *per se* violations of Sections 1 and 3 of the Sherman Act.

108.    Accordingly, Plaintiff and Class members are entitled to three times their damages caused by H&R Block's violations of Sections 1 and 3 of the Sherman Act, as well as the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction

25

prohibiting H&R Block from ever again entering into similar agreements in violation of the antitrust laws.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, on behalf of herself and the Class, demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on her behalf and that of the Class by adjudging and decreeing that:

a. This action may be maintained as a class action, with Plaintiff as the designated Class representative and her counsel as Class counsel;

b. H&R Block has engaged in a trust, contract, combination, or conspiracy in violation of Sections 1 and 3 of the Sherman Act, and that Plaintiff and the Class members have been damaged and injured in their business and property as a result of this violation;

c. The alleged combinations and conspiracy are per se violations of the Sherman Act;

d. H&R Block is enjoined from attempting to enter into, entering into, maintaining, or enforcing any no-poach agreement, or other illegal anticompetitive agreement or understanding, as alleged herein;

e. Judgment be entered for Plaintiff and Class members, and against H&R Block, for three times the amount of damages sustained by Plaintiff and the Class, as allowed by law;

f. Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

g. Plaintiff and the Class recover their costs of suit, including attorneys' fees, as provided by law; and

h.  Plaintiff and the Class are entitled to such other and further relief as is just and proper under the circumstances.

Dated: December 31, 2018

Respectfully Submitted,

Paul LLP

*Richard M. Paul III*

Richard M. Paul III, Mo. Bar No. 44233
Ashlea Schwarz, Mo. Bar No. 60102
Laura Fellows, Mo. Bar No. 65896
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
(816) 984-8100
Rick@PaulLLP.com
Ashlea@PaulLLP.com
Laura@PaulLLP.com

**WHITFIELD BRYSON & MASON, LLP**
Daniel K. Bryson
900 W. Morgan Street
Raleigh, North Carolina 27603
(919) 600-5000
dan@wbmllp.com

**GUSTAFSON GLUEK, PLLC**
Daniel E. Gustafson
Amanda Williams
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, Minnesota 55402
(612) 333-8844
dgustafson@gustafsongluek.com
awilliams@gustafsongluek.com

**GREG COLEMAN LAW, PC**
Gregory F. Coleman
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
(865) 247-0080
greg@gregcolemanlaw.com

**ATTORNEYS FOR PLAINTIFF**